

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA                :
:
                -v-                     :
:
PETER E. BERNEY,                        :
ROBERT E. POTTER,                       :
  a/k/a "Jesse Eugene Fletcher,"        :
WALTER D. CULKIN,                       :
PETER G. LIOUNIS,                       :
  a/k/a "Lefty,"                        :
CHRISTIAN T. RIZZO, and
DOUGLAS C. MIGLINO,

                Defendants.

- - - - - - - - - - - - - - - - - - - x

**FILED**

**NOV 26 2001**

CLERK, U.S. DISTRICT COURT
DISTRICT OF NEVADA

BY_____ DEPUTY

~~INDICTMENT~~

99 Cr. 937 (    )

CR-S-01-0427-HDM-PAL

        The Grand Jury charges:

## COUNT ONE

(Conspiracy To Commit
Securities Fraud and Wire Fraud)

### Relevant Persons And Entities

        1.  At all times relevant to the Indictment, TLC

Temporary & Staffing Services, Inc. ("TLC") was a Nevada

corporation in the business of providing temporary workers to

businesses.  Prior to September 1998, TLC was known as Texanne

LLC, but changed its name to TLC when it "went public" in a

September 8, 1998 reverse merger with Sterling-Manhoff, Inc.

("Sterling-Manhoff"), a publicly-traded Nevada "shell"

corporation with no significant assets, income, or business.  As

a result of the reverse merger, the common stock of TLC became

publicly traded on the National Association of Securities

TRUE COPY
JAMES M. PARKISON, Clerk

By_____
        Deputy Clerk

/

Dealers, Inc.'s ("NASD") OTC Bulletin Board.

2. At all times relevant to this Indictment, PETER E.
BERNEY, the defendant, was an individual who resided in Las
Vegas, Nevada.

3. At all times relevant to this Indictment, ROBERT
E. POTTER, a/k/a "Jesse Eugene Fletcher," the defendant, was an
individual who resided in Las Vegas, Nevada.

4. At all times relevant to this Indictment, WALTER
D. CULKIN, the defendant, was an individual who resided in
Englishtown, New Jersey.

5. At all times relevant to this Indictment, PETER G.
LIOUNIS, a/k/a "Lefty," the defendant, was an individual who
resided in Staten Island, New York.

6. At all times relevant to this Indictment, CHRISTIAN
T. RIZZO, the defendant, was an individual who resided in Staten
Island, New York.

7. At all times relevant to this Indictment, DOUGLAS
C. MIGLINO, the defendant, was an individual who resided in
Brooklyn, New York.

8. At all times relevant to this Indictment, LaJolla
Capital Corporation ("LaJolla Capital") was a broker-dealer
registered with the NASD, with its principal place of business in
San Diego, California. In or about October 1998, LaJolla Capital
changed its name to Pacific Cortez Securities, Inc. LaJolla
Capital and Pacific Cortez Securities, Inc. will collectively be

2

referred to as "LaJolla Capital" throughout this Indictment.

9. From in or about May 1998 through in or about December 1998, LaJolla Capital operated an "Office of Supervisory Jurisdiction" at 3155 Amboy Road, Staten Island, New York (the "LaJolla Staten Island Office"). An "Office of Supervisory Jurisdiction" generally refers to an office of an NASD member that, among other things, executes customer securities transactions and maintains custody of customers' funds and/or securities.

### SUMMARY

10. As set forth more fully below, from in or about May 1998 through in or about December 1998, PETER E. BERNEY, ROBERT E. POTTER, WALTER D. CULKIN, PETER G. LIOUNIS, CHRISTIAN T. RIZZO, and DOUGLAS C. MIGLINO, the defendants ("Defendants"), in order unlawfully to enrich themselves, engaged in a scheme to control and manipulate the market for TLC common stock. To effect this unlawful scheme, BERNEY and POTTER first acquired control of all or virtually all of the free-trading Sterling-Manhoff common stock, and then took TLC "public" through a reverse merger with Sterling-Manhoff. BERNEY and POTTER concealed their control of TLC common stock by placing the stock in the hands of nominees and others they controlled. BERNEY and POTTER then caused CULKIN, LIOUNIS, RIZZO, and MIGLINO to induce public investors to purchase TLC common stock through the use of

3

fraudulent means, representations, and material omissions, including: (i) the unauthorized purchase of TLC stock in customer accounts; (ii) the unauthorized sale of stock in customer accounts to generate proceeds to be used to purchase TLC stock; (iii) the use of unregistered brokers who concealed their true identity by impersonating other brokers; (iv) false representations concerning TLC's future stock performance; and (v) the failure to disclose extraordinary compensation paid to those selling or causing TLC stock to be sold. The Defendants also failed to disclose to public customers that BERNEY and POTTER effectively controlled the supply of free-trading TLC stock, and that the Defendants would be virtually the sole market for TLC stock sold to or by public investors. To further conceal the fraudulent scheme, the Defendants used corporate accounts and other means designed to conceal their receipt of the proceeds from the sale of TLC stock.

### THE FRAUDULENT SCHEME

### BERNEY Acquires Secret Control Of TLC Stock

11. Prior to on or about September 8, 1998, PETER E. BERNEY, the defendant, used nominees to secure control of all or virtually all of the free-trading common stock of Sterling-Manhoff. One of BERNEY's nominees ("Nominee No. 1") was a resident of Las Vegas, Nevada, and was the record owner of 145,000 shares of Sterling-Manhoff common stock.

4

12. On or about September 8, 1998, PETER E. BERNEY and
ROBERT E. POTTER, the defendants, arranged for TLC to "go public"
by having its predecessor company, Texanne, LLC, merge into
Sterling-Manhoff, a "shell" corporation with no significant
assets, income, or business, and whose stock was publicly traded
on the NASD's OTC Bulletin Board. Pursuant to the reverse
merger, Sterling-Manhoff exchanged its stock for the assets of
Texanne, LLC, and changed the name of the resulting company to
TLC. On or about December 1, 1998, TLC changed its name to
McBride Temporary & Staffing Services, Inc. ("McBride"). TLC and
McBride will collectively be referred to herein as TLC.

13. As a result of this reverse merger, the common
stock of TLC became publicly traded on the OTC Bulletin Board
and, as noted above, PETER E. BERNEY and ROBERT E. POTTER, the
defendants, effectively controlled all or virtually all of the
free-trading shares of TLC stock.

14. By at least in or about September 1998, Nominee
No. 1 signed a stock power authorizing the transfer of 145,000
shares of TLC stock to PETER E. BERNEY, the defendant. On or
about September 16, 1998, the stock power signed by Nominee No. 1
was sent to Sterling-Manhoff's stock transfer agent, Alpha-Tech
Stock Transfer. On or about the following day, Alpha-Tech Stock
Transfer canceled Nominee No. 1's 145,000 shares, and re-issued
145,000 shares of stock in BERNEY's name, in six different stock
certificates, including one for 100,000 shares (the "100,000

5

Share TLC Certificate") and two for 10,000 shares each (the "Two 10,000 Share TLC Certificates"). On or about September 22, 1998, BERNEY deposited the 100,000 Share TLC Certificate in a brokerage account that he controlled in the name of Cambro Investment Group, Inc. (the "Cambro Account"), which account was carried at Travis Morgan Securities, Inc. ("Travis Morgan Securities"), a broker-dealer located in Irvine, California. On or about September 21, 1998, BERNEY deposited the Two 10,000 Share TLC Certificates in a brokerage account that he controlled in the name of Watkins Glen Development Trust ("the Watkins Account"), which account was carried at Alpine Securities, Inc., a broker-dealer located in Salt Lake City, Utah.

### Sales of TLC Stock To The Investing Public

15. In or about September 1998, WALTER D. CULKIN, PETER G. LIOUNIS, and CHRISTIAN T. RIZZO, the defendants, and others, obtained approval from the owner of LaJolla Capital to sell TLC stock through the LaJolla Staten Island Office. From that date through in or about December 1998, CULKIN, LIOUNIS, and RIZZO, as well as DOUGLAS C. MIGLINO, the defendants, sold, or caused others to sell, TLC stock to the investing public from the LaJolla Staten Island Office. CULKIN, LIOUNIS, and RIZZO undertook these efforts despite the fact that they were not listed as employees on the books and records of the LaJolla Staten Island Office.

6.

16.   In selling TLC stock through "cold calls" and
other telephone solicitations to persons located throughout the
United States, PETER E. BERNEY, ROBERT E. POTTER, WALTER D.
CULKIN, PETER G. LIOUNIS, CHRISTIAN T. RIZZO, and DOUGLAS C.
MIGLINO, the defendants, used fraudulent means and made or caused
others to make, a number of misrepresentations and material
omissions to the investing public, as more fully described below.

### Unauthorized Purchases and Sales

17.   At various times relevant to the Indictment, PETER
E. BERNEY, ROBERT E. POTTER, WALTER D. CULKIN, PETER G. LIOUNIS,
CHRISTIAN T. RIZZO, and DOUGLAS C. MIGLINO, the defendants,
engaged in, or caused others to engage in, unauthorized purchases
and sales of stocks in accounts of customers of the LaJolla
Staten Island Office.  Specifically, they sold or caused others
to sell stocks in those customers' accounts in order to generate
funds to be used to purchase TLC stock, and then purchased or
caused others to purchase TLC stock with those proceeds, all
without the customers' knowledge or authorization.

### Non-Registration or Impersonation of Brokers

18.   At all times relevant to the Indictment, neither
PETER G. LIOUNIS nor DOUGLAS C. MIGLINO, the defendants, were
registered as brokers at the LaJolla Staten Island Office.   In
selling TLC stock, LIOUNIS and MIGLINO unlawfully impersonated
other brokers, and failed to reveal their true identity to the

7

investors they were soliciting.

## False Representations Regarding TLC

19. At various times relevant to the Indictment, PETER
E. BERNEY, ROBERT E. POTTER, WALTER D. CULKIN, PETER G. LIOUNIS,
CHRISTIAN T. RIZZO, and DOUGLAS C. MIGLINO, the defendants, made,
or caused others to make, false and misleading statements of
material fact to unsuspecting investors, including, but not
limited to, baseless predictions as to TLC's stock performance
that they knew to be untrue.

## Undisclosed Extraordinary Compensation

20. At various times relevant to the Indictment, PETER
E. BERNEY, ROBERT E. POTTER, WALTER D. CULKIN, PETER G. LIOUNIS,
CHRISTIAN T. RIZZO, and DOUGLAS C. MIGLINO, the defendants,
failed to disclose to unsuspecting investors that they received
extraordinary compensation for selling or causing others to sell
TLC stock. Specifically, PETER E. BERNEY and ROBERT E. POTTER,
the defendants, generally shared among themselves and others
approximately thirty-two percent (32%) of the proceeds from the
sale of TLC stock, and CULKIN, LIOUNIS, RIZZO, and MIGLINO
generally shared among themselves and others approximately sixty-
eight percent (68%) of such proceeds. In order to conceal the
extraordinary undisclosed compensation paid to CULKIN, LIOUNIS,
RIZZO, and MIGLINO, BERNEY and POTTER transferred the proceeds of
the sales of TLC stock from the Cambro Account to bank accounts

8

they controlled, and thereafter used wire transfers and shipments
of cash by courier service, among other means, to transfer the
proceeds to CULKIN. CULKIN, in turn, distributed portions of
these funds to LIOUNIS, RIZZO, and MIGLINO, among others.

### BERNEY's Control of the Market for TLC Stock

21. At all times relevant to this Indictment, PETER E.
BERNEY, ROBERT E. POTTER, WALTER D. CULKIN, PETER G. LIOUNIS,
CHRISTIAN T. RIZZO, and DOUGLAS C. MIGLINO, the defendants,
failed to disclose to public customers, or caused others to fail
to disclose, that BERNEY controlled all or virtually all of the
free-trading shares of TLC common stock, and that he was the
source of nearly all TLC common stock that the Defendants sold or
caused to be sold to public customers. Specifically, the
Defendants failed to disclose that they obtained the TLC stock
sold to customers from National Capital, LLC ("National
Capital"), a securities brokerage firm with offices in Irvine,
California, which in turn obtained the stock from Travis Morgan
Securities out of the Cambro and Watkins Accounts. Indeed, from
in or about September 1998 through in or about December 1998,
LaJolla Capital, National Capital, and Travis Morgan Securities
generated approximately ninety percent (90%) of the trading in
TLC stock.

22. As a result of this trading arrangement, PETER E.
BERNEY, ROBERT E. POTTER, WALTER D. CULKIN, PETER G. LIOUNIS,

9

CHRISTIAN T. RIZZO, and DOUGLAS C. MIGLINO, the defendants,
directed and controlled the market for trading of the shares of
TLC stock.  They controlled all or virtually all of the supply of
TLC stock initially available for sale in the market, since the
only shares available were those on deposit in the Cambro and
Watkins Accounts, and thereafter controlled all or virtually all
of the supply of free-trading TLC stock.  As a result of their
control of the market for TLC stock, from on or about September
17, 1998 to in or about December 1998, the Defendants sold, or
caused others to sell, approximately 77,800 shares of TLC stock
to customers of LaJolla Capital at prices ranging from
approximately $5.25 to $5.50 per share, resulting in total gross
proceeds of approximately $428,000.  Of that total share amount,
approximately 76,100 shares of TLC stock -- or nearly ninety-
eight percent (98%) of the total purchased by LaJolla Capital
customers -- were sold from the Cambro Account controlled by
BERNEY.

### The Extortion of "Short Sellers"

23.  In or about early October 1998, the Defendants
learned that other broker-dealers were interfering with their
fraudulent scheme to manipulate the market for TLC stock.  One of
those firms was Sharpe Capital, Inc. ("Sharpe Capital"), a
broker-dealer registered with the NASD, with its principal place
of business in New York, New York.  On or about October 1, 1998,

10

Sharpe Capital sold TLC stock "short." Selling stock "short" is a term used to describe a broker's sale of stock he does not own, with the expectation that the price of the stock will decrease by the time the broker is required to make physical delivery of the stock, thereby enabling the broker to profit from the difference between the sale price and the purchase price. Generally, selling stock "short" can cause the price of a stock to decline.

24. On or about October 1 and 2, 1998, PETER E. BERNEY, ROBERT E. POTTER, WALTER D. CULKIN, PETER G. LIOUNIS, and CHRISTIAN T. RIZZO, the defendants, expressed concern that other firms were trading TLC stock and that such "short sellers" could impede their scheme to sell TLC stock.

25. On or about October 2, 1998, PETER G. LIOUNIS, the defendant, placed a telephone call to a broker at Sharpe Capital in New York, New York, and threatened the Sharpe Capital broker to stop selling TLC stock "short." Thereafter, Sharpe Capital did not sell "short" any additional TLC stock.

### THE CONSPIRACY

26. From in or about May 1998 through in or about December 1998, in the Southern District of New York and elsewhere, PETER E. BERNEY, ROBERT E. POTTER, WALTER D. CULKIN, PETER G. LIOUNIS, CHRISTIAN T. RIZZO, and DOUGLAS C. MIGLINO, the defendants, together with others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and

11

agree together and with each other to commit offenses against the United States, to wit, to commit (a) securities fraud, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and Section 240.10b-5 of Title 17, Code of Federal Regulations, and (b) wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

27. It was a part and an object of the conspiracy that PETER E. BERNEY, ROBERT E. POTTER, WALTER D. CULKIN, PETER G. LIOUNIS, CHRISTIAN T. RIZZO, and DOUGLAS C. MIGLINO, the defendants, together with others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which

12

operated and would operate as a fraud and deceit upon a person in connection with the purchase and sale of securities, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### Wire Fraud

28. It was a further part and an object of the conspiracy that PETER E. BERNEY, ROBERT E. POTTER, WALTER D. CULKIN, PETER G. LIOUNIS, CHRISTIAN T. RIZZO, and DOUGLAS C. MIGLINO, the defendants, together with others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme and artifice, among other things, to (a) deprive a broker's client of the intangible right to a broker's honest services; (b) violate a broker's duty to disclose to his client all material facts concerning securities transactions in the client's account; and (c) obtain the client's money and property, would and did transmit and cause to be transmitted by means of wire communications in interstate commerce, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346.

## MEANS AND METHODS OF THE CONSPIRACY

29. Among the means and methods by which PETER E. BERNEY, ROBERT E. POTTER, WALTER D. CULKIN, PETER G. LIOUNIS, CHRISTIAN T. RIZZO, and DOUGLAS C. MIGLINO, the defendants, and others known and unknown, would and did carry out the conspiracy were the following:

a. PETER E. BERNEY, ROBERT E. POTTER, WALTER D. CULKIN, PETER G. LIOUNIS, CHRISTIAN T. RIZZO, and DOUGLAS C. MIGLINO, the defendants, controlled all or virtually all of the supply of free-trading TLC stock through a reverse merger with Sterling-Manhoff.

b. PETER E. BERNEY, ROBERT E. POTTER, WALTER D. CULKIN, PETER G. LIOUNIS, CHRISTIAN T. RIZZO, and DOUGLAS C. MIGLINO, the defendants, sold, or caused others to sell, TLC stock to the investing public through fraudulent means, representations, and material omissions, including: (i) unauthorized purchases of TLC stock in customer accounts; (ii) unauthorized sales of stock in customer accounts to generate proceeds to be used to purchase TLC stock; (iii) the use of unregistered brokers who concealed their true identity by impersonating other brokers; (iv) false representations concerning TLC's future stock performance; and (v) the failure to disclose extraordinary compensation paid to those selling or causing TLC stock to be sold.

14

c.   PETER E. BERNEY, ROBERT E. POTTER, WALTER D. CULKIN, PETER G. LIOUNIS, CHRISTIAN T. RIZZO, and DOUGLAS C. MIGLINO, the defendants, sold, or caused others to sell, TLC stock to the investing public without disclosing that BERNEY controlled the market for TLC stock by controlling the supply of that stock, and by causing LaJolla Capital to fill customer orders with stock that he supplied.

d.   WALTER D. CULKIN, PETER G. LIOUNIS, and CHRISTIAN T. RIZZO, the defendants, used implicit and explicit threats of violence and intimidation to prevent others who were trading TLC stock from interfering with their fraudulent scheme.

### OVERT ACTS

30.   In furtherance of said conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   In or about August and September 1998, PETER E. BERNEY, the defendant, caused TLC to "go public" through a reverse merger with Sterling-Manhoff.

b.   On or about September 15, 1998, PETER E. BERNEY, the defendant, informed WALTER D. CULKIN, the defendant, by telephone of the stock symbol for TLC.   -

c.   On or about September 15, 1998, WALTER D. CULKIN, the defendant, called a co-conspirator not named as a

15

defendant herein and informed him of the stock symbol for TLC.

  d. On or about September 17, 1998, PETER E. BERNEY, the defendant, informed WALTER D. CULKIN, the defendant, by telephone that BERNEY could cause a securities broker-dealer to place a bid in the market for TLC stock at $5.00.

  e. On or about September 21, 1998, PETER E. BERNEY, the defendant, caused 14,000 shares of the common stock of TLC to be sold from the Cambro Account.

  f. On or about September 22, 1998, PETER E. BERNEY, the defendant, caused the 100,000 Share TLC certificate to be deposited in the Cambro Account.

  g. On or about September 22, 1998, WALTER D. CULKIN and CHRISTIAN T. RIZZO, the defendants, discussed on the telephone sales of TLC stock by brokers in the LaJolla Staten Island Office.

  h. On or about September 24, 1998, PETER E. BERNEY and ROBERT E. POTTER, the defendants, caused a wire transfer of approximately $67,675, representing the proceeds of the sale of TLC stock in the Cambro Account, to be sent from the Cambro Account to a bank account in the name of Cambro Investment Group at the Bank of America in Las Vegas, Nevada.

  i. On or about September 28, 1998, WALTER D. CULKIN and CHRISTIAN T. RIZZO, the defendants, discussed by telephone the states in which TLC stock could be sold to customers of LaJolla Capital.

16

     j.   On or about September 30, 1998, PETER E. BERNEY and ROBERT E. POTTER, the defendants, caused a wire transfer of approximately $25,000, representing the proceeds of the sale of TLC stock in the Cambro Account, to be sent from an account at the Bank of America in Las Vegas, Nevada to an account controlled by WALTER D. CULKIN, the defendant, at First Union National Bank in Manalapan, New Jersey.

     k.   On or about October 1, 1998, ROBERT E. POTTER, WALTER D. CULKIN, and CHRISTIAN T. RIZZO, the defendants, discussed by telephone coordinating purchases and sales of TLC stock between LaJolla Capital and National Capital.

     l.   On or about October 1, 1998, WALTER D. CULKIN and CHRISTIAN T. RIZZO, the defendants, had a telephone conversation in which they discussed threatening an employee of Sharpe Capital, either in person or over the telephone.

     m.   On or about October 2, 1998, PETER G. LIOUNIS, the defendant, made a threatening telephone call to a broker at Sharpe Capital in New York, New York, in which LIOUNIS threatened the Sharpe Capital broker to stop selling TLC stock "short."

     n.   On or about October 2, 1998, PETER G. LIOUNIS, the defendant, informed WALTER D. CULKIN, the defendant, by telephone that LIOUNIS had called Sharpe Capital and another brokerage firm and "f***in' ripped" them about selling TLC stock "short."

17

o.    On or about October 9, 1998, PETER G. LIOUNIS and WALTER D. CULKIN, the defendants, discussed by telephone that LIOUNIS gave DOUGLAS C. MIGLINO, the defendant, "five dimes," or $5,000.

p.    On or about October 14, 1998, PETER E. BERNEY and ROBERT E. POTTER, the defendants, caused approximately $42,800 in cash, representing the proceeds of the sale of TLC stock in the Cambro Account, to be sent via Federal Express to WALTER D. CULKIN, the defendant.

q.    On or about October 20, 1998, WALTER D. CULKIN and DOUGLAS C. MIGLINO, the defendants, discussed by telephone sales of stock by brokers in the LaJolla Staten Island Office.

r.    On or about October 23, 1998, ROBERT E. POTTER, the defendant, caused a wire transfer of approximately $7,000, representing the proceeds of the sale of TLC stock in the Cambro Account, to be sent from an account in POTTER's name at the Bank of America in Las Vegas, Nevada to an account controlled by WALTER D. CULKIN, the defendant, at First Union National Bank in Manalapan, New Jersey.

s.    On or about November 12, 1998, ROBERT E. POTTER and WALTER D. CULKIN, the defendants, discussed by telephone the division of approximately $68,000, representing the proceeds of the sale of TLC stock in the Cambro Account, and transfer to CULKIN of approximately $36,700 of those proceeds.

18

t.   On or about November 12, 1998, WALTER D.
CULKIN, the defendant, informed CHRISTIAN C. RIZZO, the
defendant, by telephone that CULKIN was expecting to receive
approximately $36,700, representing the proceeds of the sale of
TLC stock.

u.   On or about November 17, 1998, ROBERT E.
POTTER and WALTER D. CULKIN, the defendants, discussed by
telephone the transfer to CULKIN of approximately $11,000,
representing a portion of the proceeds of the sale of TLC stock
in the Cambro Account.

v.   On or about November 24, 1998, PETER E.
BERNEY and ROBERT E. POTTER, the defendants, caused approximately
$18,500 in cash, representing the proceeds of the sale of TLC
stock in the Cambro Account, to be sent via Federal Express to
WALTER D. CULKIN, the defendant.

(Title 18, United States Code, Section 371.)

## COUNT TWO

(Conspiracy to Commit Extortion)

The Grand Jury further charges:

31.  Paragraphs 1 through 26 and 29 through 30 are
realleged and incorporated by reference as though fully set forth
herein.

32.  In or about early October, 1998, in the Southern
District of New York and elsewhere, WALTER D. CULKIN, PETER G.

19

LIOUNIS, a/k/a "Lefty," and CHRISTIAN T. RIZZO, the defendants, together with others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to commit extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), to wit, by obtaining money and property from and with the consent of the owners and operators of a securities brokerage firm, namely, Sharpe Capital, Inc., induced by the wrongful use of actual and threatened force, violence, and fear, and thereby would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3).

(Title 18, United States Code, Section 1951).

## COUNT THREE

### (Extortion)

The Grand Jury further charges:

33.   Paragraphs 1 through 26 and 29 through 32 are realleged and incorporated by reference as though fully set forth herein.

34.   On or about October 2, 1998, in the Southern District of New York and elsewhere, PETER G. LIOUNIS, a/k/a

"Lefty," the defendant, together with others known and unknown to the Grand Jury, unlawfully, unlawfully, willfully, and knowingly did commit, and attempted to commit, extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), by obtaining money and property from and with the consent of the owners and operators of a securities brokerage firm, namely, Sharpe Capital, Inc., induced by the wrongful use of actual and threatened force, violence, and fear, and thereby did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3).

(Title 18, United States Code, Sections 1951 and 2).

_____
FOREPERSON

MARY JO WHITE
United States Attorney

21

TOTAL P.22